THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE COURT

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| SELMA ROADHOUSE COMPANEROS, LP, | § | CASE NO. 09-35553-HDH-11 |
| | § | |
| Debtor. | § | |

### DEBTOR'S SECOND COMBINED PLAN AND DISCLOSURE STATEMENT
### Dated: January 22, 2010

**THIS COMBINED PLAN AND DISCLOSURE STATEMENT IS SUBMITTED TO ALL CREDITORS OF DEBTOR ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION HEREIN DESCRIBED AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO ACCEPT OR REJECT DEBTOR'S PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE. THIS COMBINED PLAN AND DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE AS TO DEBTOR'S PLAN OF REORGANIZATION. ALL CREDITORS AND INTEREST HOLDERS ARE URGED TO READ THE COMBINED PLAN AND DISCLOSURE STATEMENT AND ATTACHMENTS WITH CARE AND IN THEIR ENTIRETY.**

**THIS COMBINED PLAN AND DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE COURT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE. ALL CREDITORS HAVE THE RIGHT TO OBJECT TO THIS DISCLOSURE STATEMENT AS NOT CONTAINING ADEQUATE INFORMATION AS REQUIRED UNDER SECTION 1125(b).**

**THE PLAN, AS DESCRIBED HEREIN, PROVIDES FOR THE FULL PAYMENT OF ALL ALLOWED CLAIMS, INCLUDING GENERAL UNSECURED CLAIMS. ACCORDINGLY, THE DEBTOR URGES ALL CREDITORS TO VOTE FOR THE PLAN.**

Selma Roadhouse Companeros, LP ("Selma" or "Debtor") is a Texas limited liability company organized for the purpose of acquiring and operating a restaurant in San Antonio, Texas. The 1% General Partner is Selma Camino Management, Inc., whose President is Cory Strickland. There are 29 limited partners, each holding an interest of between 0.667% and 10.667%. Selma is managed by the General Partner.

Selma filed for Chapter 11 bankruptcy protection on August 26, 2009. Selma owns the restaurant property located at 14855 I-35 North, Selma, Texas (the "Property"). The Property is leased to Chuy's Opco, Inc., which operates a restaurant on the premises (collectively, "Chuy's").

After the filing of the bankruptcy petition, Selma was authorized to continue in business under the protection of the Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Code") and to attempt to work out an arrangement with Creditors on a plan for payment of its debt. This document explains how Selma proposes to pay Creditors and remain in business. If the Bankruptcy Court approves this Plan, Creditors' rights to collect their debt will be limited by federal law including the Code. If the Plan is approved, Creditors will only be allowed to collect their debt from Selma as provided in this document.

**1. Why Did Selma File this Bankruptcy Case?**

Debtor's sole asset is the Property. The Debtor's primary secured lender with respect to the Property is Herring Bank ("Herring"), and in August, 2009, Herring Bank began to send the notices necessary for Herring to proceed with a foreclosure sale of the Property in September, 2009 or October, 2009.

The Debtor attempted to work things out with Herring inasmuch as the default was occasioned by losses sustained after closing the restaurant formerly operated by the Debtor at the Property and seeking a new tenant. More specifically, the Property in question for several years prior to the commencement of this case housed a restaurant known as Selma Roadhouse, which restaurant was once owned and operated by Debtor. (In February 2008, the Selma Roadhouse restaurant operation — but not the Property itself — was acquired by Ruby Tequila's Mexican Kitchen, LLC. ("RTMK"), a Texas limited liability company that has management personnel in common with Debtor.)

The Selma Roadhouse restaurant closed in January, 2009, and contemporaneously with the closing, Debtor commenced a process to obtain the Property's current tenant, Chuy's, which is a well-known and very successful Tex-Mex restaurant chain based in Austin, Texas. Chuy's entered into a lease with Debtor and occupied the Property in March, 2009. The lease between Debtor and Chuy's is for a minimum term of fifteen (15) years. The Chuy's lease substantially improved the value of the Property for the short term and the long term.

In support of the lease with Chuy's, an entity known as Restaurant Land Investment, Inc. borrowed funds and acquired a tract of land contiguous with the Property (the "RLI Property"). The acquisition of the RLI Property was necessary to provide all of the parking spaces necessary for Chuy's use and occupancy of the Property. RLI and Debtor have entered into an easement concerning the RLI Property for the benefit of the Property. In order to acquire the Property, RLI borrowed money from Interstate Bank. As of January 2010, the amount owed to Interstate Bank is approximately $178,000. The interest rate is at 5.5%. Monthly payments are $3,400.02. The loan matures August 28, 2014. A continuing easement on the RLI Property is necessary for the Chuy's lease to remain in place.

In connection with acquisition of the RLI Property by RLI, Interstate Bank had an appraisal done of the Property. The effective date of the appraisal was December 11, 2007, and the Property was appraised at a value of $255,000. The summary of the appraisal is attached hereto and incorporated herein as Exhibit 4. It is noted that RLI is making monthly payments that are substantially higher than the payments it anticipates receiving pursuant to the proposed Plan treatment. It is further noted that as of the date of this Disclosure Statement, RLI has not received any adequate protection payments.

Like RTMK, Restaurant Land Investment, Inc. has some management and some ownership in common with Debtor. The individual responsible for management of Debtor, RTMK, and RLI is Cory Strickland ("Strickland"). RLI is owned one-third each by a family limited partnership of which Strickland is the managing partner, RTMK, and Charles Lovett, who is Strickland's father-in-law. The interest of RTMK was acquired from David Pencsak (a former officer, employee, and owner of RTMK, and a former owner of Debtor).

Strickland closely communicated with Herring throughout the wind-down of the Selma Roadhouse restaurant, the successful negotiation of the Chuy's lease by Debtor, and RLI's acquisition of the Property, among other events. During this process, Herring granted Debtor a reprieve of payments on

the note for the time period during which Selma Roadhouse restaurant ceased operations and Chuy's rent commenced. Debtor and Strickland believed that Herring would refinance the indebtedness that is the subject of this case. Based on the expected refinancing, Debtor and Strickland undertook a series of actions including the acquisition of the RLI Property and negotiation and execution of the Chuy's lease. Despite extensive negotiations and communications between Debtor, Strickland, and Herring, the expected refinancing did not occur.

Instead, despite Debtor's contention that a national well known and valuable tenant such as Chuy's enhanced the value of the Property and reduced Herring's risks, Herring determined it would proceed with foreclosure.

This bankruptcy proceeding became necessary to avoid the foreclosure sale. Default notices were served by Herring to the Debtor during August, 2009. Accordingly, the Debtor elected to commence a Chapter 11 reorganization proceeding in order to protect the value of the estate and the rights of other creditors and the investors.

Debtor's real estate property and the Chuy's lease provide substantially all of Debtor's value. Debtor previously had the Property appraised in September of 2005. That appraisal placed a value on the Property of $2,900,000. Debtor has obtained an updated appraisal of the Property since the institution of the Chuy's lease. The updated appraisal for the Property is $2,350,000 (compared to Herring's appraisal of $2,300,000). However, this appraisal considers only the base terms of the lease and the values the cash flow of the Chuy's lease, rather than evaluating a comparative sales value of the underlying property itself. Debtor believes this approach understates the actual value of Debtor's property because the valuation does not take into account the future Percentage Rent to be received by Debtor under the Chuy's lease. According to the appraiser, he cannot take into account Percentage Rent until such time as there is a basis for establishing the Percentage Rent. That cannot occur until Chuy's completes its first full year of operation, which is expected to occur in April of 2010. According to an Addendum to the Appraisal provided by the Appraiser, a hypothetical appraisal based on Percentage Rent as projected by Debtor for its Plan would increase the appraisal from in the amount of $10.00 for every $1.00 received in Percentage Rent which is expected to be approximately $1,000,000 over the life of the Chuy's lease after the Percentage Rent Credit is applies.

**2.      What Has Happened Since the Bankruptcy Case Was Filed?**

Since filing bankruptcy, Selma has continued to operate its business as a debtor-in-possession. It has continued to collect rent from Chuy's and pay its ongoing ordinary business expenses. Further, Selma has begun to negotiate agreements with some of its creditors to allow it to continue in business and repay its debt. Selma has not reached an agreement with Herring.

**3.      What are the Basic Terms of the Chuy's Lease?**

The lease with Chuy's is a fifteen (15) year lease with renewal options. Base Rent is the minimum annual amount to be paid by Chuy's. Base Rent is as follows:

    A.      Years 1 through 5:        $205,000

    B.      Years 6 through 10:       $215,250

C.      Years 11 - 15:            $226,012

In addition, Chuy's is liable to pay Percentage Rent calculated as five percent (5%) of Chuy's sales, less the Base Rent.  During the initial years of the rent, Chuy's is entitled to a credit against Percentage Rent of fifty percent (50%) of the Percentage Rent each year until a cumulative amount of $150,000 has been paid.  It is anticipated that that Percentage Rent credit will be collected by offset by Chuy's through the first five (5) years of the Plan.

The lease is a triple net lease, requiring Chuy's to pay ad valorem property taxes and insurance in addition to rent.  Current sales for the year 2009 are projected to be approximately $5,100,000.  Management of Selma believes that expected sales growth would reasonably be three percent (3%) to five percent (5%).  However, for purposes of the Plan, sales growth has been assumed to be two percent (2%) per year.

Base Rent is paid monthly.  Percentage Rent is paid annually in March following the previous calendar year and such payment would be available to be paid to creditors in April of each year commencing in 2010 following the Effective Date.

Debtor is current with all obligations under the lease.  In approximately November of 2009, Chuy's placed Debtor on notice of a possible issue relating to obtaining a City permit with respect to the parking lot which is included in the lease.  Debtor believed that the issue raised was Chuy's responsibility under the lease and formally responded to Chuy's on December 7, 2009.  Debtor believes the matter has been resolved.  Since inception of the lease, Debtor has never received any formal or informal communication from Chuy's alleging any actual or apparent default by Debtor under the lease.

Strickland has 18 years experience in the restaurant business.  During that time, Strickland has, and continues to be, responsible for the financial aspects of the operation of numerous restaurant properties.  As part of his job responsibilities and professional career, Strickland has observed the restaurant market for a number of years and has been involved in forecasting future sales and revenue growth for restaurant business operations.  Strickland is very familiar with current trends and economics of the restaurant business.  Strickland applied his restaurant experience and used that expertise in arriving at a conservative sales growth assumption for Chuy's revenue of 2.0% per year.  Additional factors considered which support the sales growth figure are the fact that Chuy's is a nationally known, well run company with a long history of operation.  Chuy's operates 18 or so restaurants across the country.  Strickland further considered and relied upon industry guidelines, including an audit report of restaurants prepared by SS&G (a leading accounting and auditing firm for the restaurant industry), which shows sales growth in the restaurant industry over the last five years to be 3-5%.  (The source material for this estimate is published information from the Texas Restaurant Association.)

**4.      How Does Selma Propose to Pay its Debts?**

Selma's revenue from the lease with Chuy's consists of "Base Rent" and "Percentage Rent."  In the unlikely event total rent is insufficient to pay all scheduled claims, the payment to unsecured creditors may be deferred to the extent necessary to first satisfy secured claims.

A.      <u>Class 1 - Ad Valorem Taxes</u>.  Ad valorem tax authorities will be paid in full as such taxes become due.  Taxes due for the year 2009 will be paid when due on or before February 1, 2010 in the amount of $53,032.99.  Debtor and RTMK will each pay $4,419.42 of the 2009 taxes.  Chuy's, pursuant to the terms of its lease, will pay the balance of $44,194 on or before the statutory due date for such payment.  Property taxes for future years will be timely paid by Chuy's pursuant to the terms of the lease.

B.    <u>Secured Debt - Herring</u>.   Selma will continue to pay Herring its full principal of $1,885,421 and interest at the rate of 6.5% per annum in monthly payments of $11,917.  The payments are amortized over 360 months.  The loan will mature and a balloon balance will be due at the end of 180 months.  Further, Chuy's, under the lease, will continue to pay the property taxes due on the Property and will maintain acceptable insurance on the Property.  Herring shall enjoy all liens and protections it is afforded in its pre-petition loan documents until the entire indebtedness is paid in full.

C.    <u>Secured Debt - SBA</u>.   Selma will continue to pay the Small Business Administration ("SBA") its full principal of $456,038 and interest at the rate of 5.39% per annum in monthly payments of $2,558.  The payments will be amortized over 360 months.  SBA shall enjoy all liens and protections it is afforded in its pre-petition loan documents until the entire indebtedness is paid in full.

D.    <u>Secured Debt - RLI</u>.   Selma currently owes a note to RLI with principal due in the amount of $198,000 for a parking easement on the RLI Property.  For no additional consideration, RLI will contribute to Debtor a fee interest in the RLI Property covered by the easement, which will merge with the easement and thereby transfer title to the RLI Property to Debtor.  RLI will retain a security interest in the RLI Property to secure the existing note and will be paid interest at the rate of 6.5% per annum and monthly payments of $1,251.  The payments will be amortized over 360 months.  The loan will mature and a balloon balance will be due at the end of 180 months.  RLI's claim will be secured by the RLI Property, and RLI shall enjoy all liens and protections it is afforded in loan documents to be finalized upon confirmation of the Plan until the entire indebtedness is paid in full. Payments due to RLI will be subordinated to payments due Herring and SBA.  In other words, Plan payments to RLI may only be made if Selma is current on its Plan payments to Herring and SBA.

E.    <u>Secured Debt - Other</u>.   Selma will pay other secured creditors with inferior liens to Herring and SBA the full principal due and interest at the rate of 4.0% per annum over eight (8) years in equal annual payments of $10,289 from proceeds of Percentage Rent.  Payments will begin April 15, 2010 and will be due annually for an additional seven (7) years.  The other secured creditors hold a third lien behind Herring and SBA and pursuant to the terms of their agreements are to be paid from Percentage Rent received by Selma.  This Plan provision modifies the rights of the other secured creditors to fix their payments in an annual amount rather than being paid as a percentage of Percentage Rent received by Selma.  In the event Percentage Rent is not sufficient to make a full payment in any particular year, the unpaid amount will be deferred to future years; however, the entire balance will be due April 15, 2017. The only members of this class are believed to be Michael Parker and Vernon Parker, who are the ex-in-laws of David Pencsak.  The Parkers loaned money to Debtor based on representations made by David Pencsak.  (Mr. Pencsak is a former employee and owner of Debtor.)  The Parkers were initially to be paid from a share of the "Percentage Rent" under the Chuy's lease.

The other secured creditors and the deemed allowed amount of their claims are:

| Creditor | Claim |
|----------|-------|
| Michael Parker | $50,000 |
| Vernon Parker | 20,000 |

F.    <u>Unsecured Debt</u>.   The allowed unsecured claims will be paid by Selma from an unsecured creditors' fund which will be set up by Selma within sixty (60) days after the confirmation of this Plan.  Selma will deposit $37,000 into the fund annually beginning in March 2010 and continuing each year thereafter for an additional six (6) years.  In March 2017, Selma will deposit the balance remaining necessary to pay the claims in full, which amount is expected to be $57,000.  Selma will

disburse the funds in the account within ten (10) days of the fifteenth (15th) day of April each year. The allowed unsecured claims will be paid each year on a pro rata basis. Selma will pay a total of $316,007 to the holders of allowed unsecured claims. ***The payout to unsecured creditors should be 100% of their allowed unsecured claims.*** In any year in which cash flow is insufficient to fund the required payment, Selma shall pay only such amount as is available. Any unpaid amount will be accrued and paid from available future rent in addition to the required annual deposit. It is anticipated the unsecured creditors will be paid in eight (8) years. The unsecured creditors, and deemed allowed amounts of their claims, are:

| Creditor | Debt | Claim Description |
|---|---|---|
| Cory Strickland | $ 42,000 | Money loaned - insider |
| Scratch Cookin, Inc. | 62,018 | Money loaned - insider |
| The Retail Connection, LP | 79,998 | Brokerage fee owed |
| Sprouse Shrader Smith P.C. | 27,263 | Legal fees owed |
| Strategic Equipment | 67,228 | Judgment |
| David Pencsak | 37,500 | Promissory note |
| **Total** | **$316,007** | |

G.    Cash Flow. Selma's cash flow will be improved as Chuy's sales grow and the Percentage Rent increases. Selma projects that it will generate net monthly cash flow of from $21,250 to $23,000 per month over the sixty (60) months commencing in January 2010. As the ordinary business income will be sufficient to fund the minimal ongoing monthly operating costs, there should be sufficient income for Selma to continue operations and fund the Plan payments. Annual operating costs are estimated to be 2.5% of Base Rent. *See* **Exhibit 1**, attached hereto and incorporated by reference herein.

H.    Litigation. Selma has no ongoing litigation and no intention at the present time to commence any litigation except for possible claims against Herring. Such litigation would be funded by related parties. Selma and Strickland believe some of Herring's conduct may be actionable under lender liability theories. Debtor is exercising its duty to other creditors to investigate such claims. Herring has vigorously denied that any such liability exists and has asserted that litigation to pursue such claims would be without merit.

**5.    Creditors Divided into Classes.**

The Bankruptcy Code requires Selma to divide creditors into classes. That is, creditors with similar legal rights are put into the same class. All creditors and the classes they are in are shown in Paragraph 10 of this document.

**6.    Creditors Have the Right to Vote on the Plan.**

After reading this Plan and Disclosure Statement, Creditors will have the right to vote on whether the Bankruptcy Code should confirm this Plan. Each creditor should read this Combined Plan and Disclosure Statement carefully, discuss it with a lawyer, and then fill out the ballot that is attached. Selma will assemble the ballots and report to the Bankruptcy Judge on _____, 2010. The Court will conduct the "Confirmation Hearing" in this case to decide whether to confirm the Plan on _____, 2010 at the Bankruptcy Court, 1100 Commerce St., 14th Floor, Courtroom #3, Dallas, Texas, 75242.

7.      **Creditors Also Have the Right to Object to this Disclosure Statement and Creditors Have the Right to Object to the Confirmation of the Plan.**

If a creditor believes this Combined Plan and Disclosure Statement does not contain sufficient information to decide whether to vote for or against the Plan, the creditor may file a written objection with the Bankruptcy Court.  If a creditor believes that the Plan does not meet the requirements of the Bankruptcy Code, the creditor may file a written objection with the Bankruptcy Court.

8.      **The Court May Approve this Plan and Limit Creditor's Legal Rights.**

The Court will consider only written objections that are timely filed and ballots that are timely submitted.  If no objections are filed (or if all objections are overruled by the Court) and at least one (1) class of creditors accepts the Plan, the Court may approve the Plan.  If the Court approves the Plan, all creditors will be bound, even if a creditor did not vote and even if a creditor voted against the Plan.  This means that a creditor will not be allowed to collect its claim against Selma except as provided in the Plan.

9.      **How Does a Class "Accept" the Plan?**

Each class is considered separately.  Only the creditors who vote are counted.  The Court will conclude that the class "accepts" the Plan if two requirements are met: (a) more than 50% of the voting creditors vote in favor of the Plan; and (b) those creditors voting in favor of the Plan hold at least two-thirds (2/3) of the total amount of the debt that is voted.

10.     **Which Class are You as a Creditor In, and How Does Selma Propose to Treat the Class Under the Plan?**

The following is a list and classification of Selma's creditors and how Selma proposes to pay them under the Plan:

Class 1:    Secured -Ad Valorem Taxing Entities

> Debtor owes the 2009 ad valorem taxes to Bexar County in the amount of $53,032.99 if paid by February 1, 2010.  This claim will be paid as set forth in Paragraph 3.A. Further, Class 1 Claims are entitled to retention of all property tax liens, including those for post-petition taxes, until all taxes, penalties, and interest provided by those liens have been paid.  Class 1 Claims shall be paid interest at the rate of twelve percent (12%) per annum from the Petition Date or as otherwise required by the Texas Tax Code to the extent that any such Class 1 Claims are not paid by the statutory payment deadline.  Class 1 Claims for the 2010 tax year and subsequent tax years, which are incurred post-confirmation, will be timely paid when otherwise due without necessity of any claim being filed, or be subject to state court collection remedies with further recourse to the Bankruptcy Court.  This class is unimpaired.

Class 2:    Secured – Herring.

> This class is comprised of Herring, having valid first liens on Debtor's real property located at 14855 I-35 North, Selma, Texas.  This class shall receive the treatment set forth in Paragraph 3.B.  This class is impaired.

Class 3:    Secured - SBA

> This class is comprised of SBA, having valid second liens on Debtor's real property located at 14855 I-35 North, Selma, Texas. This class shall receive the treatment set forth in Paragraph 3.C. This class is impaired.

Class 4:    Secured - RLI

> This class is comprised of RLI, having a valid first lien on the RLI Property being contributed to Debtor located at 14855 I-35 North, Selma, Texas. This class shall receive the treatment set forth in Paragraph 3.D. This class is impaired.

Class 5:    Secured - Other

> This class is comprised of creditors having inferior liens to Herring and SBA on Debtor's real property located at 14855 I-35 North, Selma, Texas. This class is comprised of the creditors identified in Paragraph 3.E. This class shall receive the treatment set forth in Paragraph 3.E. This class is impaired.

Class 6:    Unsecured Creditors

> This class is comprised of the unsecured creditors identified in Paragraph 3.F. This class shall receive the treatment set forth in Paragraph 3.F. This class is impaired.

> Debtor believes that the unsecured creditors will receive 100% of their claims.

Class 7:    Equity Interests

> The remaining class is the Equity Interest Holders of Selma. The Equity Interest Holders will retain their interests. The Equity Interest Holders are listed on **<u>Exhibit 2</u>**, attached hereto and incorporated by reference herein. This class is unimpaired.

## 11.    Parties Other Than Debtor are Being Afforded Protection Under the Plan.

Certain individuals and entities may be liable for payment of some of the debts of Selma as guarantors or co-debtors. Such guarantors and/or co-debtors include Strickland. Pursuant to the Plan, all guarantors and/or co-debtors shall remain liable in their capacity as guarantors on any debt for which they would be liable under state law or the relevant loan documents. However, per the provisions of this Plan and the order confirming this Plan, all creditors receiving payment of their claims shall be enjoined from directly pursuing any of the guarantors and/or co-debtors for collection of the underlying claims so long as Debtor is current with its payment obligations pursuant to the Plan.

*Specifically, upon confirmation of the Plan, all creditors of Debtor having an allowed claim herein shall be temporarily enjoined, pursuant to Section 105 of the Code, from proceeding against any guarantor, co-debtor, officer, director, shareholder, employee, or other responsible person of Debtor, individually, including, but not limited to, Cory Strickland, for the collection of all or any portion of their allowed claim, said injunction to remain in effect only for so long as Debtor complies with the terms of the Plan. Any violation of the Plan that remains uncured for sixty (60) days after receipt by Debtor of written notice from any party affected by such violation, shall automatically and without order of the Court result in the dissolution of the injunction granted hereunder as to said affected party. In any event,*

*the non-Debtor injunction shall expire sixty (60) days after the last Plan-related payment has been made with respect to the Debtor as reorganized pursuant to this Chapter 11 plan when confirmed (the "Reorganized Debtor.")*

**12.    Why are Creditors Being Enjoined from Collection Against Certain Parties?**

Strickland provides the ongoing management of Debtor pursuant to this Plan in his capacity as President of the General Partner. Strickland and Debtor share an identity and interests such that a suit against Strickland is essentially a suit against Debtor. A third-party action against Strickland will have an adverse impact on Debtor's ability to accomplish reorganization. Strickland's efforts are essential to the successful completion of the Plan and the protection of the interests of other creditors and the equity investors. Strickland is not retaining on account of the Plan any direct interest in Debtor so his continued efforts generally benefit third parties.

Strickland is absolutely necessary to the day-to-day operations of Debtor. Strickland's role in the operations includes the role any landlord would have with respect to management of the Property with regard to the tenant. Strickland is involved with issues relating to the real property with the City of San Antonio. He is involved in federal, state, and local tax issues relating to Debtor. In addition to the time required to address issues raised by Herring, Strickland is involved in negotiations with the various other parties and lienholders, including the SBA, the Parkers, and the various taxing authorities. Strickland is responsible for communicating with the various equity partners regarding the Property. Strickland is responsible for assuring that there is sufficient cash flow each month to meet Debtor's obligations. This will be an especially important function upon confirmation of the Plan to ensure that Debtor complies with all provisions of the Plan. For example, while no cash flow issues are anticipated under the proposed Plan, in the event that the cash flow is inadequate on a temporary basis to meet Debtor's obligations in any particular month, then it would be the obligation of Strickland to arrange a solution for such a cash flow issue. This could include Strickland personally, or through a related entity, providing money to Debtor to meet a temporary cash flow situation. (In this regard, it is again noted that under the Plan, RLI is receiving less than half of its current obligation on the secured debt against the RLI Property. That cash flow difference is presently being funded by the owners of RLI, which include two entities managed by Strickland.) Finally, Strickland's efforts are going to be invaluable in marketing of the Property at the appropriate time. (Just as Strickland's expertise made it possible to get the Chuy's lease in place.) Strickland's expertise in the restaurant business, and loyalty to all parties in this case, makes him the only logical person to undertake the marketing function.

Further, Mr. Strickland is a principal in RLI. As an accommodation and a concession in order to make the Plan feasible, RLI has agreed to contribute a fee interest in its real property (in which Debtor currently only holds an easement) to Debtor. The contribution is made without receiving additional compensation. Further, RLI retains its current note and has agreed to terms which subordinate payments to RLI to the payments of Herring and SBA.

Finally, the Plan is a 100% Plan pursuant to which all creditors are being paid the full amount of their claims.

**13.    What Compensation is Being Paid to Strickland?**

Strickland is not initially receiving any direct compensation from Debtor. Related entities may charge Debtor minimal management fees and bill for reimbursement of expenses. However, beginning in the sixth (6th) year of the Plan, Strickland shall be entitled to receive from the Debtor a

guaranty fee in the amount of no more than 2.5% percent of the total rent collected by the Debtor annually.

**14.     What if a Creditor is Not Listed in Paragraph 10 Above?**

Paragraph 10 lists all creditors who will have an allowed claim.  All claims that Selma agrees to pay (or that are disputed) are listed in Paragraph 10.

**15.     How Does Selma Propose to Remit its Payments to its Creditors?**

The claims of all other creditors will be paid directly by Selma as provided in this Plan.

**16.     How Does Selma Propose to Pay its Administrative Expenses and Fee Claims Under the Plan?**

As of the date of confirmation, Selma anticipates that it will owe administrative professional fees to its attorneys totaling about $37,000.  Each person/professional asserting a fee claim for services rendered or expenses incurred during Selma's Chapter 11 proceeding shall file with the Bankruptcy Court and serve on the United States Trustee, Selma and its counsel, a fee application within thirty (30) days after confirmation of Selma's Plan.

Unless otherwise agreed by the holder of an administrative claim and its professionals, each shall receive from Selma the amount of its allowed claim payable within ten (10) days from the latter of fifteen (15) days after confirmation of the Plan or after the Bankruptcy Court's approval of their respective fee applications.

**17.     Does Selma Intend to Assume its Executory Contracts/Leases?**

Selma has a lease with Chuy's, which lease is critical to the success of this Plan.  Selma will assume the lease, continuing to perform all obligations as landlord and continuing to collect the rent.

The Debtor shall assume any easement which (i) constitutes an unexpired lease or excecutory contract and (ii) is necessary for the effective operation of the Chuy's restaurant or the Property.

**18.     Will Selma Continue to File Operating Reports with the Court after Confirmation?**

The Reorganized Debtor shall timely pay on the Effective Date all pre-confirmation quarterly fees owed to the United States Trustee.  The Reorganized Debtor also shall timely pay post-confirmation quarterly fees assessed under 28 U.S.C. § 1930(a)(6) until such time as the Bankruptcy Court enters a final decree closing this Chapter 11 case, or enters an order either converting this case to a case under Chapter 7 or dismissing this case.  After confirmation, the Reorganized Debtor shall timely file with the Bankruptcy Court and, shall transmit to the United States Trustee, a true and correct statement of all disbursements for each quarter, or portion thereof, that this Chapter 11 case remains open in a format prescribed by the United States Trustee.

**19.     What to Do for More Information?**

Creditors should talk to a lawyer about their rights and the responsibilities in this case.  Creditors should have their lawyers call the lawyer for Debtor.  Debtor's lawyer is: Jeff Carruth; telephone: 972-938-7334, facsimile: 972-923-0430; email:  jcarruth@bcylawyers.com.

If a creditor does not have a lawyer, but still wants more information, that creditor can call Debtor's lawyer directly. HOWEVER, REMEMBER THAT DEBTOR'S LAWYER CANNOT GIVE CREDITORS LEGAL OR FINANCIAL ADVICE BECAUSE DEBTOR'S LAWYER REPRESENTS DEBTOR, NOT CREDITORS.

**20.** **How Much Does Selma Propose to Pay Creditors?**

Creditors will get 100% of the amount of their claims. Some secured creditors will receive interest as well. See Paragraph 10 above for specific treatment.

**21.** **Does Selma Have Enough Money and Earnings to Make the Payments Called for in the Plan?**

Yes. This will be accomplished with cash flow. *See* attached Exhibit 1.

**22.** **Are There Any Alternatives to the Plan?**

There are two alternatives: liquidation or dismissal. Liquidation will not bring a sufficient amount to pay the secured debts in full. Consequently, unsecured creditors would not be paid any distribution on their claims. *See* attached **Exhibit 3**, attached hereto and incorporated by reference herein.

While Debtor does not consider it a formal alternative to confirmation of the Plan, Debtor asserts that it fully intends, consistent with the Plan, to take advantage of any recovery in the real estate market to look for an opportunity to sell the real property of Debtor for sufficient funds to pay off all Plan obligations and provide a return to the equity holders. However, that marketing plan cannot be initiated until such time as a longer history is achieved under the Chuy's lease and the Percentage Rent which will be paid under the lease is better known. Such a strategy is implicit in Debtor's Plan because not all creditors will be paid off by the end of the 15-year term of the Chuy's lease, and at the end of that term, it will be required that Debtor either refinance the Property with existing secured creditors or arrange a sale of the Property for a sufficient amount to pay all remaining balloon balances in full. Based on the expected appreciation of the Property over time and the reduced balances of the secured debts over time, Debtor believes that it can easily accomplish either a refinancing or a sale prior to the end of Chuy's lease term.

**23.** **Is There Any Risk That the Plan Might Not Succeed?**

Yes. If Selma is unable to maintain the current cash flow, then it may not be able to make the Plan payments as set forth in Paragraph 10. That is unlikely to occur unless Chuy's defaults on the lease.

**24.** **Are There Any Tax Effects of this Plan?**

Selma suffers no adverse tax effects because of the Plan. Creditors should consult their own tax advisors.

25.     **Please Vote for this Plan.**

**Selma asks that the Creditors vote in favor of this Plan because it will allow Selma to pay all of its creditors in full and still stay in business.**  Selma believes that payments to be made under the Plan will be more than the creditors will receive if the Plan is not confirmed.

**REMEMBER THAT THE DEADLINE FOR BALLOTS IS _____ (the "Ballot Deadline").**

Ballots may be transmitted by U.S. Mail, facsimile, or email to counsel for the Debtor as set forth below, but any ballots must be received prior to the Ballot Deadline in order for the ballot to be counted.

Counsel for the Debtor:
REED & ELMQUIST, P.C.
Attention: Jeff Carruth
604 Water Street
Waxahachie, Texas 75165
Fax:  972-923-0430
Email:  jcarruth@bcylawyers.com

A ballot for the purpose of voting for or against the Plan is enclosed.  If you did not receive a ballot or would like another ballot, please contact counsel for the Debtor.

26.     **Vesting of Property in the Reorganized Debtor.**

On the Effective Date, all property of Selma shall vest in the Reorganized Debtor free and clear of all liens, claims, interests, and charges arising on or before the confirmation of the Plan, except as provided in this Plan or in the confirmation order on the condition that the Reorganized Debtor complies with the terms of the Plan, including making all payments to creditors provided for in this Plan.  If the Reorganized Debtor defaults in performing under the provisions of this Plan and this case is converted to a case under Chapter 7 prior to substantial consummation of this Plan, all property vested in the Reorganized Debtor and all subsequently acquired property owned as of or after the conversion date shall re-vest and constitute property of the bankruptcy estate in the converted case.

27.     **Effective Date.**

The Effective Date of the Plan shall be the date that the order confirming the Plan becomes a final and non-appealable order.

28.     **Miscellaneous provisions.**

A.  Discharge.

Except as otherwise expressly provided in the Plan, the rights and treatment afforded in the Plan shall discharge all existing security interests, liens, debts, and claims of any kind, nature, or description whatsoever against the Debtor or any of its assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code; upon the Effective Date, all existing claims against the Debtor shall be, and shall be deemed to be, discharged, and all holders of claims shall be precluded from asserting against

the Debtor, or any of its assets or properties, any other or further claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder filed a proof of Claim. confirmation of the Plan and the obligations imposed on the Debtor and/or the Reorganized Debtor herein shall be in complete satisfaction, discharge and release of all claims of any nature whatsoever against the Debtor and/or the Reorganized Debtor or any of its assets or properties; and, upon the Effective Date, the Debtor shall be deemed discharged and released from any and all claims, including but not limited to demands and liabilities that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code that arise prior to the Confirmation Date, whether or not (a) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a claim based upon such debt is allowed under section 502 of the Bankruptcy Code, or (c) the holder of a claim based upon such debt has accepted the Plan. Except as provided herein, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor. As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtor at any time obtained, to the extent it relates to a claim discharged and operates as an injunction against the prosecution of any action against the Debtor or its property, to the extent it relates to a claim discharged. The discharge granted herein shall not discharge the Reorganized Debtor from the obligations in the Plan.

 B. Exculpation and Release.

 *Neither the Debtor, nor its Representatives, shall have or incur any liability to any holder of a claim or interest for any act, event, or omission in connection with, or arising out of, the Bankruptcy Case, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence. As of the Effective Date, each administrator, officer, and director of the Debtor who served in such capacity from and after the Petition Date, the Debtor, and the Representatives, shall be deemed to be released from all claims, demands, and suit, known or unknown, fixed or contingent, liquidated or unliquidated, whether or not asserted, that may be held or asserted by the Debtor, Reorganized Debtor, or any current or former holder of a claim or interest regarding or related to the Debtor or the Debtor's operations, other than the obligations under the Plan. "Representative" for purposes of this paragraph means and refers to any principal, agent, responsible party, officer, director, financial advisor, attorney, accountant, and other professional persons of the Debtor at any point from the petition date to the Effective Date, including but not limited to Reed & Elmquist, P.C. and its employees, attorneys, assistants, and employees and contractors.*

 C. Insurance.

 Confirmation and consummation of the Plan shall have no effect on assumed insurance policies or premium financing of the Debtor in which the Debtor is or was the insured party; the Reorganized Debtor shall become the insured party or beneficiary, as applicable, under any such policies. Each insurance company or premium finance lender is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering, or delaying coverage on any basis regarding or related to the Debtor's bankruptcy, the Plan, or any provision within the Plan.

 D. De Minimis Distributions.

 No distribution of less than $10.00 shall be required to be made to any holder of an allowed claim. Such undistributed amount may be retained by the Reorganized Debtor for distribution to other holders of allowed claims.

 E. Post-Effective Date Fees and Expenses of Professional Persons.

 The Reorganized Debtor shall, in the ordinary course of business and without the necessity for any notice, motion, fee application, or approval by the Bankruptcy Court, pay the reasonable fees and

expenses arising post-Effective Date of the professional persons employed by the Reorganized Debtor. Any disputes regarding such fees and expenses shall be submitted to the Bankruptcy Court.

F.   Release of Claims Upon Completion of the Plan.

Upon final payment required by the Plan, the Debtor shall be released from any and all claims and causes of action of the Reorganized Debtor or the Debtor's estate that could be asserted against such pursuant to the Plan, and the Reorganized Debtor shall be discharged from its duties and powers under this Plan.

G.   Integration Clause.

This Plan is a complete, whole, and integrated statement of the binding agreement between the Debtor, creditors, and the parties-in-interest upon the matters herein.

H.   Severability.

Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any claim or interest or transaction, the Debtor may modify the Plan so that such provision shall not be applicable to the holder of any claim or interest.   Such a determination of unenforceability shall not (a) limit or affect the enforceability and operative effect of any other provision of the Plan or (b) require the resolicitation of any acceptance or rejection of the Plan.

I.   Documentation to Reflect Treatment Under the Plan

The Debtor and its secured creditors may, at the Debtor's discretion, enter into new loan documents following the Effective Date to memorialize the treatment described herein.

J.   Notices

Notice required by the Plan shall be sent as follows:

*If to the Reorganized Debtor:*

|  |  |
|---|---|
|  | *with copy to:* |
| SELMA ROADHOUSE COMPANEROS, LP | REED & ELMQUIST, P.C. |
| Attn. Mr. Cory S. Strickland | Attention: Jeff Carruth |
| 3220 Church St. | 604 Water Street |
| Amarillo, Texas 79109 | Waxahachie, Texas 75165 |
|  | Fax:  972-923-0430 |
|  | Email:  jcarruth@bcylawyers.com |

DATED:  January 22, 2010

Respectfully submitted,

REED & ELMQUIST, P.C.
604 Water Street
Waxahachie, Texas 75165
Tel:   (972) 938-7334
Fax:  (972) 923-0430
E-mail:  jcarruth@bcylawyers.com

By:    /s/ Jeff Carruth
    Jeff Carruth (SBT #24001846)

**COUNSEL FOR DEBTOR**

**SELMA ROADHOUSE COMPANEROS, LP**

By:   Selma Camino Management, Inc.,
     its General Partner


By:     /s/ Cory S. Strickland
      Cory S. Strickland
      President

Selma plan + ds 20091207.2 FINAL

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE COURT**

# EXHIBITS

SELMA ROADHOUSE COMPANEROS, LP                                    **EXHIBIT 1**
DEBTOR'S FIRST COMBINED PLAN AND DISCLOSURE STATEMENT

### Amortization Schedules

| Creditor | Principal | Rate | Months | Payment | Annual Amount |
|---|---|---|---|---|---|
| Herring | 1,885,421 | 6.50% | 360 | 11,917 | 143,006 |
| SBA | 456,038 | 5.39% | 360 | 2,558 | 30,695 |
| RLI | 198,000 | 6.50% | 360 | 1,251 | 15,018 |
| Other | 70,000 | 4.00% | 96 | 853 | 10,239 |
| | | | | | |
| Totals | 2,609,459 | | | 16,580 | 198,958 |

| Unsecured Debts | 8 years | Annual Payments |
|---|---|---|
| The Retail Connection | 79,998 | 10,000 |
| Strategic | 67,228 | 8,404 |
| Sprouse Shrader Smith | 27,263 | 3,408 |
| David Pencsak | 37,500 | 4,688 |
| Totals | 211,989 | 26,499 |

| Unsec. Insider Debt | 8 Years | |
|---|---|---|
| Cory Strickland | 42,000 | 5,250 |
| Scratch cooking | 62,018 | 7,752 |
| Totals | 104,018 | 13,002 |

### CASH FLOW

| | | Years | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| Chuy's | Sales at 2% Growth | 2.00% | 5,100,000 | 5,202,000 | 5,306,040 | 5,412,161 | 5,520,404 | 5,630,812 | 5,743,428 | 5,858,297 | 5,975,463 | 6,094,972 | 6,216,872 | 6,341,209 | 6,468,033 | 6,597,394 | 6,729,342 |
| Revenue | | | | | | | | | | | | | | | | | |
| | Base rent | | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 | 215,250 | 215,250 | 215,250 | 215,250 | 215,250 | 226,012 | 226,012 | 226,012 | 226,012 | 226,012 |
| | Percentage rent | | 50,000 | 55,100 | 60,302 | 65,608 | 71,020 | 66,291 | 71,921 | 77,665 | 83,523 | 89,499 | 84,832 | 91,048 | 97,390 | 103,858 | 110,455 |
| | Percent Rent Credit - Chuys | | (25,000) | (27,550) | (30,151) | (32,804) | (34,495) | | | | | | | | | | |
| Class 5 | Class 5 - Other Secured | | (10,239) | (10,239) | (10,239) | (10,239) | (10,239) | (10,239) | (10,239) | (10,239) | | | | | | | |
| | Total revenue | | 219,761 | 222,311 | 224,912 | 227,565 | 231,286 | 271,302 | 276,932 | 282,676 | 298,773 | 304,749 | 310,844 | 317,060 | 323,402 | 329,870 | 336,467 |
| | | | | | | | | | | | | | | | | | |
| | Cash reserve | | 33,000 | 21,917 | 13,384 | 7,452 | 4,173 | 4,615 | 37,778 | 76,431 | 100,676 | 197,880 | 300,910 | 409,613 | 524,377 | 645,325 | 772,578 |
| | Available Cash | | 252,761 | 244,228 | 238,296 | 235,017 | 235,459 | 275,917 | 314,710 | 359,107 | 399,450 | 502,629 | 611,753 | 726,673 | 847,779 | 975,194 | 1,109,045 |
| Payments | | | | | | | | | | | | | | | | | |
| | Operating Expenses | 2.50% | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 5,381 | 5,381 | 5,381 | 5,381 | 5,381 | 5,650 | 5,650 | 5,650 | 5,650 | 5,650 |
| | | | | | | | | | | | | | | | | | |
| Class 2 | Herring | | 143,006 | 143,006 | 143,006 | 143,006 | 143,006 | 143,006 | 143,006 | 143,006 | 143,006 | 143,006 | 143,006 | 143,006 | 143,006 | 143,006 | 143,006 |
| Class 3 | SBA | | 30,695 | 30,695 | 30,695 | 30,695 | 30,695 | 30,695 | 30,695 | 30,695 | 30,695 | 30,695 | 30,695 | 30,695 | 30,695 | 30,695 | 30,695 |
| Class 4 | RLI | | 15,018 | 15,018 | 15,018 | 15,018 | 15,018 | 15,018 | 15,018 | 15,018 | 15,018 | 15,018 | 15,018 | 15,018 | 15,018 | 15,018 | 15,018 |
| | Secured Other | | | | | | | | | | - | - | - | - | - | - | - |
| Class 6 | Unsecured | | 37,000 | 37,000 | 37,000 | 37,000 | 37,000 | 37,000 | 37,000 | 57,007 | - | - | - | - | - | - | - |
| | | | | | | | | | | | - | | | | | | |
| | Guarantor Fee | 2.50% | - | - | - | - | - | 7,039 | 7,179 | 7,323 | 7,469 | 7,619 | 7,771 | 7,927 | 8,085 | 8,247 | 8,412 |
| | | | | | | | | | | | | | | | | | |
| | Total cash uses | | 230,844 | 230,844 | 230,844 | 230,844 | 230,844 | 238,139 | 238,280 | 258,430 | 201,570 | 201,719 | 202,140 | 202,296 | 202,454 | 202,616 | 202,781 |
| | | | | | | | | | | | | | | | | | |
| | Ending Cash | | 21,917 | 13,384 | 7,452 | 4,173 | 4,615 | 37,778 | 76,431 | 100,676 | 197,880 | 300,910 | 409,613 | 524,377 | 645,325 | 772,578 | 906,264 |

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

IN RE: CHAPTER **11**

**Selma Roadhouse Companeros, LP**


DEBTOR(S) CASE NO **09-35553-HDH**


## LIST OF EQUITY SECURITY HOLDERS

| Registered Name of Holder of Security Last Known Address or Place of Business | Class of Security | Number Registered | Kind of Interest Registered |
|---|---|---|---|
| Barron Family Partnership, Ltd. Dr. RD Barron 23 Crenshaw Amarillo, TX 79124 | limited partner | 2.666667% | |
| Brian Twomey 6607 Vanderbuilt Ave Dallas, TX 75214 | limited partner | 0.666667% | |
| Burkett Family Investments, LP c-o Burkett Management LLC Mr. Randy Burkett 6408 Hatfield Amarillo, TX 79109 | limited partner | 10.666667% | |
| Carl Robinson 7815 Stuyvesant Ave. Amarillo, TX 79121 | limited partner | 2.666667% | |
| Clearview Staffing Software Jon Pencsak, David Gorman 16801 Addison Road, Suite 105 Addison, TX 75001 | limited partner | 2.666667% | |
| CTPM Family, LP 44 Cypress Point Amarillo, TX 79124 | limited partner | 7.695% | |
| D&C Franklin Family, LP Mr. David Franklin 5403 Drane Drive Dallas, TX 75235 | limited partner | 10.666667% | |
| David Franklin 5403 Drane Drive Dallas, TX 75235 | limited partner | 3.61% | |
| Doug Urquhart 5964 Meletio Lane Dallas, TX 75230 | limited partner | 2.666667% | |
| Greg Davis 11302 Williamsburg Houston, TX 77024 | limited partner | 2.666667% | |
| Ian Wolfman 7106 Azalea Lane Dallas, TX 75230 | limited partner | 1.333333% | |

EXHIBIT 2

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

IN RE:                                                             CHAPTER   **11**

**Selma Roadhouse Companeros, LP**


DEBTOR(S)                                                 CASE NO   **09-35553-HDH**


## LIST OF EQUITY SECURITY HOLDERS

*Continuation Sheet No. 1*

| Registered Name of Holder of Security<br>Last Known Address or Place of Business | Class of Security | Number Registered | Kind of Interest Registered |
|---|---|---|---|
| Jeff Neely, III<br>1101 S. Taylor<br>Amarillo, TX 79101 | limited partner | 2.666667% | |
| Jerry Pharr<br>6208 Private Road 6470<br>Lubbock, TX 79416 | limited partner | 2.666667% | |
| John Carroll<br>7406 Bull Creek Road<br>Houston, TX 77095 | limited partner | 2.666667% | |
| Kent F. Hofstad<br>624 Hunters Way<br>New Braunfels, TX 78132-4775 | limited partner | 2.666667% | |
| LK2002<br>Attn: Dr. Kirk Coury<br>#10 Care Circle, Suite A<br>Amarillo, TX 79124 | limited partner | 2.666667% | |
| M&S Camino, LLC<br>Attn: Mr. Matt Franklin<br>17430 Campbell Road, No. 200<br>Dallas, TX 75252 | limited partner | 2.666667% | |
| Mary Margaret Gibson<br>PO Box 560550<br>The Colony, TX 75056 | limited partner | 2.666667% | |
| Michael V. Parker<br>2054 Sawgrass Ridge<br>San Antonio, TX 78260 | limited partner | 2.666667% | |
| Mick Twomey<br>6100 Shady Oaks<br>Frisco, TX 75034 | limited partner | .666667% | |
| Noal Investment Company, LC<br>Mr. Edwin B. Alderson, Jr.<br>2020 West 19th Street<br>El Dorado, AR 71730 | limited partner | 2.666667% | |
| Pencsak Revocable Trust<br>Attn: Ms. Nancy Pencsak<br>PO Box 560550<br>The Colony, TX 75056 | limited partner | 2.666667% | |

EXHIBIT 2

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

IN RE:                                          CHAPTER   **11**

**Selma Roadhouse Companeros, LP**


DEBTOR(S)                                       CASE NO   **09-35553-HDH**


## LIST OF EQUITY SECURITY HOLDERS

*Continuation Sheet No. 2*

| Registered Name of Holder of Security Last Known Address or Place of Business | Class of Security | Number Registered | Kind of Interest Registered |
|---|---|---|---|
| POS Solutions Mr. Allen Devino 2101 Donley Drive, Suite 107 Austin, TX 78758 | limited partner | 2.666667% | |
| Robert Wood 8503 Trenton Lubbock, TX 79424 | limited partner | 2.666667% | |
| Scratch Cookin, Inc. 3220 Church St. Amarillo, TX 79109 | limited partner | 7.695% | |
| Selma Camino Management, LLC 14855 IH 335N Schertz, TX 78154-3345 | | 1% | General Partner |
| Shalom Parnters Attn: Mr. Martin Lewis 2308 W. 5th Plainview, TX 79072 | limited partner | 2.666667% | |
| Sheron Babb 2921 Scarborough Lane West Colleyville, TX 76034 | limited partner | 2.666667% | |
| Strickland Restaurant Holdings, LLC Attn: Cory Strickland 44 Cypress Point Amarillo, TX 79124 | limited partner | 2.666667% | |
| W Malone Enterprises, LLC Mr. Willis Malone PO Box 32108 Amarillo, TX 79120 | limited partner | 2.666667% | |

## DECLARATION UNDER PENALTY OF PERJURY
## ON BEHALF OF A CORPORATION OR PARTNERSHIP

I, the _____**President of General Partner**_____ of the _____**Partnership**_____
named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.


Date:__**09/10/2009**_____          Signature:__**/s/ Cory S. Strickland**_____
                                                          ***Cory S. Strickland***
                                                          **President of General Partner**

SELMA ROADHOUSE COMPANEROS, LP
DEBTOR'S FIRST COMBINED PLAN AND
DISCLOSURE STATEMENT

<u>**EXHIBIT 3**</u>

**LIQUIDATION ANALYSIS**
**Draft.  Subject to Final Revision.  Not an Admission of Liability.**
**Prepared November 24, 2009**

| ASSETS | ESTIMATED VALUE | ESTIMATED LIQUIDATION VALUE | SECURED CLAIMS | RESIDUAL VALUE / DEFICIENCY CLAIM |
|---|---|---|---|---|
| Selma property, leased to Chuy's | 2,900,000 | 2,250,000 Note 1 Note 2 | 2,718,405 | (468,405) |

| SECURED CLAIMS | Amount per Schedule D |
|---|---|
| Bexar County (Debtor's portion prior to lease) | $14,718.00 |
| Herring Bank | $1,885,421.49 |
| Texas Certified Development Corp. (SBA) | $456,037.77 |
| Restaurant Land Investment, Inc. | $225,000.00 |
| Strategic Equipment | $67,228.14 |
| Michael Parker | $50,000.00 |
| Vernon Parker | $20,000.00 |
| **TOTAL** | $2,718,405.40 |

<u>**Note 1:**</u>  A Restricted Appraisal Report dated November 5, 2009 and filed by Herring Bank in this case concludes that the current market value of the Property is $2,250,000.00.  Although the Debtor disagrees with this valuation and believes that the market value of the property to be much higher, the valuation in the amount of $2,250,000.00 is used as a starting point for the estimated liquidation value of the property contained herein.

<u>**Note 2:**</u>  The estimated liquidation value does not take into account broker's commissions, trustee commissions, attorneys' fees and expenses, and other possible surcharges, expenses, and deductions.

**EXHIBIT 4**

**A SELF CONTAINED COMPLETE APPRAISAL REPORT OF**

**The Fee Simple Estate Market Value**
**of an Existing Commercial Building**
**Located at 8142 Old Austin Road**
**Selma, Bexar County, Texas 78148**

**File No. 071205**

**PREPARED FOR**
Mr. Gene Mayfield
Interstate Bank, SSB
5085 S. Coulter Drive
Amarillo, Texas 79119

**EFFECTIVE DATE OF APPRAISAL**
December 11, 2007

**PREPARED BY**
**COMMERCIAL REALTY ADVISORS, INC.**
8260 Liberty Park, Suite 100
San Antonio, Texas 78015

EXHIBIT 4

# PART I
# INTRODUCTION

**EXHIBIT 4**

# COMMERCIAL REALTY ADVISORS, INC.

*Real Estate Investment Services*

December 19, 2007

Mr. Gene Mayfield
Interstate Bank, SSB
5085 S. Coulter Drive
Amarillo, Texas 79119

Re:   File No. 071205. An appraisal report of the "As Is" Value of an Commercial Building
      located at 8142 Old Austin Road, Selma, Bexar County, Texas 78148.

Dear Mr. Mayfield:

Per your request, we have made an investigation and analysis of the following described
property and the improvements associated with the site:

### P-8B, CB 5044A, Bexar County, Texas

The subject appraisal has been prepared in order to estimate the market value as defined
subsequently in this report, where the value reported reflects a market value for the rights
in realty.    Information provided by our client, owner, and/or the on-site property
management and used in this analysis includes history of the property, legal description,
and survey.

The subject property was physically inspected on December 11, 2007 and the value
reported is based on the date of inspection.  The property value is based on the subject's
"As Is" value.  This appraisal report has been prepared and reviewed by staff appraisers
associated with Commercial Realty Advisors, Inc., each of whom is recognized and
acknowledged by individual resume and by signature on the Certificate following the
Correlation and Final Value Estimate.

The appraisers are unbiased with respect to the parties involved and have no present nor
contemplated future interest in the property appraised.  Accordingly, statements of fact are
to the best of the appraisers' knowledge correct and compensation for making the appraisal
has in no manner been contingent upon the value conclusions reported herein.

**EXHIBIT 4**

Mr. Gene Mayfield
December 19, 2007
Page Two

In the case of the subject property, it is our opinion that it would require under twelve months marketing and exposure time to realize the total market value potential of the subject property.

The appraisal has been made in compliance with the requirements of the Code of Professional Ethics and the Uniform Standards of Professional Practice of the Appraisal Institute, the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation (USPAP), Title 12 of the Code of Federal Regulations (FIRREA), and subject to the enclosed Statement of Limiting Conditions and Assumptions. Further, this appraisal report has been prepared at the request of and for the benefit of Interstate Bank, SSB.

This report is prepared subject to the "Certification and Final Value Estimate" and certain assumptions and limiting conditions which are delineated within the text of this report. Any use of this study should be done only after thoroughly reviewing the summary of all such assumptions and limiting conditions. The property is being appraised assuming that there are no environmental conditions nor other hazards adversely affecting the subject. Based on our investigation and analyses, we have derived the following Fee Simple Estate value estimates for the subject property, all as of the date of inspection, December 11, 2007:

**Market Value - *Improved Property, As Is***
**ONE HUNDRED SEVENTY THOUSAND DOLLARS**
**$170,000**

**Market Value - Excess Land**
**EIGHTY-FIVE THOUSAND DOLLARS**
**$85,000**

**Aggregate Value**
**TWO HUNDRED FIFTY-FIVE THOUSAND DOLLARS**
**$255,000**

**SIGNIFICANT ASSUMPTIONS** - None.

The value conclusion stated above is based on an effective date of December 11, 2007. The following report provides an analysis of the subject property and its relationship to the neighborhood and general market conditions. The report also sets forth the methodology and procedures utilized in our analysis.

Respectfully submitted,
COMMERCIAL REALTY ADVISORS, INC.

Robert J. Thompson, MAI
Field Appraiser
Texas Certified General Appraiser TX-1320267-G